1
2
3
4
5
6
7
8
9
10
11
12
13

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ALAN JUSTIN SMITH,

                            Petitioner,

        v.

JEFFREY UTTECHT,

                            Respondent.

Case No. C21-940-TL-SKV

REPORT AND RECOMMENDATION

## I.    INTRODUCTION AND SUMMARY CONCLUSION

Petitioner Alan Smith is a state prisoner who is currently confined at the Coyote Ridge Corrections Center in Connell, Washington.  He has filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 seeking relief from his 2015 Snohomish County Superior Court judgment and sentence.  Dkt. 24.  Respondent has filed an answer addressing Petitioner's federal habeas claims and has submitted relevant portions of the state court record.  *See* Dkts. 30-33. Petitioner has filed a response to Respondent's answer.  Dkt. 35.  This Court, having reviewed Petitioner's second amended petition, all briefing of the parties, and the balance of the record, concludes that the petition should be denied, and this action should be dismissed with prejudice.

REPORT AND RECOMMENDATION
PAGE - 1

## II.    FACTUAL BACKGROUND

The Washington Court of Appeals, on direct appeal, summarized the facts underlying

Petitioner's conviction as follows:

On February 12, 2013, Susann Smith, wife of Alan Smith, did not show up for work. Her employer called the police, who went to her residence and found her lying face down in the bathtub. Her death was caused by multiple head injuries and asphyxia due to drowning.

At the time of her death, Susann had been separated from Smith for over a year and the two were in the midst of acrimonious dissolution proceedings. Smith was frustrated and angry with the way the proceedings were going and was very concerned that Susann would take the children away from him and return to her home country of Germany.

Fall 2012, Smith was involved with a woman named Rachel Amrine. He told Amrine that he would like to just get rid of Susann and asked if she knew of a way to make that happen without anyone knowing. In a joking manner, they discussed the possibility of using potassium chloride or a rubber mallet to kill someone. When Smith again mentioned his desire to have Susann disappear, however, Amrine started to wonder if he was being serious.

Smith purchased a rubber mallet and a pair of disposable coveralls in October 2012. Forensic testing and analysis indicated that Susann's injuries were consistent with the type of mallet that Smith purchased, but did not conclusively establish that her wounds were caused by that type of mallet. Fabric impressions found at the scene were also consistent with the impressions that would have been left by the coveralls that Smith purchased.

Susann's body was found in the home she formerly shared with Smith. There were no signs of forced entry and the door was unlocked. Blood was found in the bedroom, the bathroom, and near the front door. There were bloody footwear impressions in the kitchen, the hallway, and leading to the front door. A hand towel found under the body contained Smith's DNA.

Based on surveillance footage and eyewitness accounts, there had been a man riding a bike near Susann's residence early in the morning on February 12, 2013.[1] Smith had purchased a bicycle from Gregg's Green Lake in November

---

[1] This sentence is inaccurate. The evidence presented at trial established that the man riding the bicycle was observed on the morning of February 11, 2013, not February 12, 2013. *See* Dkt. 33, Ex. 77 at 10-11.

REPORT AND RECOMMENDATION
PAGE - 2

2012.  A few weeks after Susann's death, the bike was found abandoned in a ravine across from Smith's apartment complex.

A global position system (GPS) device found in Smith's vehicle, provided data that allowed investigators to track Smith's movements.  The Bothell police observed that on February 12, 2013, Smith made some detours from his usual daily route from home to his children's day care and then to his job at Boeing.  That morning he stopped at some dumpsters in an Albertsons' parking lot after stopping at the day care center.[2]  Around 2:00 p.m., Smith left Boeing and drove in the vicinity of Susann's residence.  The road leading to her home was barricaded, however, by police who were investigating her death.  Smith then drove to a gas station and later returned to Boeing.

Smith's internet search history for February 2013 revealed searches for flights to Venezuela and Canada, initially for one adult and two children.  After he was notified of his wife's death, however, he began to search for tickets for only one adult.

The investigation into Susann's death continued for a number of months[.]  During that time, in June 2013, Smith began dating a woman named Love Thai.  Thai and Smith wanted to attend City Church's Belltown campus.  They were told that because of their involvement in the homicide investigation they could not attend services at any of the City Church campuses or be part of the church's community groups.

Smith met Wendell Morris, a City Church group leader at a church-sponsored event.  Sometime after learning that she and Smith could no longer attend services at City Church, Thai contacted Morris's wife.  The Morrises decided to meet with Thai and Smith to "minister the Word of God" to them.  Verbatim Report of Proceedings (VRP) (4/14/14) at 192-194.

Morris had been an associate minister at Eastside Baptist Church (Eastside Baptist).  He left Eastside Baptist in 2010 and joined City Church, intending to "lessen [his] profile" and "shed the title of 'associate minister.'"  *Id.* at 177-78.  In his words, he wanted to become merely "a man of God among other men of God."  *Id.*  After a year, Morris sought out additional opportunities with City Church and became a small group leader.  Morris did not tell Smith that he had previously been an associate minister at Eastside Baptist.

Morris testified that he had agreed to meet Smith at a coffee shop in South Lake Union.  When Morris arrived, Thai approached him, told him that Smith was

---

[2]  This sentence is also inaccurate.  The evidence presented at trial established that Petitioner stopped in the Albertson's parking lot near some dumpsters on the morning of February 11, 2013, not February 12, 2013.  *See* Dkt. 33, Ex. 77 at 12.

REPORT AND RECOMMENDATION
PAGE - 3

outside in his car, and that he needed some support. Morris went to Smith's car and saw that Smith was upset. Morris told Smith that he had come "to point [him] to the Lord, [and] the Word of God." *Id.* at 196. Smith began to speak with Morris about some of his recent struggles.

Morris told Smith that he needed to know if Smith was involved in the murder of his wife. Smith looked around and expressed concern about how "safe" the area was. *Id.* at 201. Morris told Smith that whatever he said would stay between the two of them.

The two decided to take a walk, and then Smith said "[w]hat you asked me about in the car, the answer is yes." VRP (4/04/14) at 203. When asked for clarification, Smith stated, "'I did it to her,'" and became emotional. *Id.* at 204. Smith then looked at Morris and stated "I trust what you do with this information." *Id.* Morris understood Smith's comment to mean that he had Smith's permission to take his statements to the authorities.

Smith and Morris continued their conversation and Smith indicated that he would like to be baptized. Morris decided that they could go that day to the Citadel church in Des Moines, because it was open late. When they arrived at the Citadel they discovered that the church did not have a baptistery. Morris had mentioned earlier that he could possibly baptize Smith and he agreed to do so at Alki beach in West Seattle.

During the next few days, Morris contacted Smith by phone and text message to try to persuade him to speak with the authorities. When Smith declined to turn himself in, Morris called the police on June 25, 2013.

Smith was charged with first degree murder with a deadly weapon, with the aggravating factor of domestic violence. He moved to suppress evidence of his statements to Morris. At the suppression hearing, the court heard testimony from ministers from Eastside Baptist and City Church.

Pastor Arthur C. Banks, from Eastside Baptist Church, Tacoma, testified that an ordained minister for his church is one who has been examined by several churches within the denomination and has received a recommendation that he or she has met the spiritual qualifications to be ordained. If Eastside Baptist accepts the recommendation, then that person is ordained, and he or she can perform all of the functions of a pastor without supervision.

Pastor Banks further testified that Morris had become a licensed associate minister with Eastside Baptist. He explained the role of the licensed associate ministers and that they may only perform duties at Eastside Baptist under the supervision of the pastor. For example, a licensed associate minister would not be

REPORT AND RECOMMENDATION
PAGE - 4

able to perform a baptism, communion, wedding, or funeral without being supervised by a pastor.

Pastor Banks confirmed that when Morris joined City Church, he became a member of that church and was no longer a member of Eastside Baptist. At that point neither Eastside Baptist nor Pastor Banks had any authority over Morris. The pastor also testified that Eastside Baptist does not have an organized confession but asks its congregation to confess to God; on occasion when Pastor Banks counsels members, he tells them upfront that he reserves the right to notify authorities if they have done anything harmful or illegal.

Pastor Jason Michalski from City Church testified that its policies required church staff to inform their members that any information they share may be disclosed to other staff members, and that the church reserves the right to report the content of a disclosure to the authorities. He also explained that City Church is "not a church that necessarily you need to go confess your sins to a pastor or a leader or anyone." VRP (4/14/14) at 140. Pastor Michalski also testified that the "City Groups" were small community groups of members that would meet outside of service to discuss particular topics or portions of scripture. Pastor Michalski confirmed that Morris served as a City Group leader, but testified that Morris was never a licensed or ordained minister at City Church.

The trial court found that Morris was not acting as a member of the clergy for Eastside Baptist when he spoke with Smith and that he did not have any authority from Eastside Baptist to counsel anyone or perform a baptism. The trial court also found that Morris never became a licensed or ordained minister with City Church and that he was not acting as a City Group leader when he spoke with Smith. While it was undisputed that Morris told Smith that their conversation would stay between the two of them, the trial court determined that the communication was not confidential because Morris was acting in his individual capacity. The trial court also found Smith's statement – "I respect what you do with this information" – led Morris to believe that Smith understood that he would go to the civil authorities with the information. Based on these findings, the trial court concluded that Smith had not sustained his burden of showing that his statements were protected by clergy-penitent privilege.

At trial, the State presented photographs of bloody footwear impressions found in the kitchen and bathroom of Susann's residence. Sgt. Shelly Massey, a forensic identification specialist for the Royal Canadian Mounted Police, compared these photographs to inked impressions of Smith's feet (bare and wearing socks). Sgt. Massey testified that based on the impression left at the scene, she was "unable to exclude and in fact . . . would include Mr. Smith as a possible source of who could have made this particular impression." Id. at 64. Smith moved the court for

REPORT AND RECOMMENDATION
PAGE - 5

a *Frye*[3] hearing to determine the admissibility of Sgt. Massey's testimony, arguing that the use of barefoot morphology evidence is not generally accepted in the scientific community. The trial court denied the motion because Sgt. Massey made a physical comparison of the prints and could not state an opinion more definite than that Smith was a "'possible maker of the footprints." CP at 890.

Smith was found guilty and sentenced to 344 months. Prior to sentencing, Smith moved for new counsel, arguing that he had received deficient representation and that he and his attorney had an irreconcilable conflict. The trial court found that any conflict between Smith and counsel arose from differences of opinion with regard to trial tactics, and that his complaints did not rise to the level of ineffective assistance of counsel. . . .

Dkt. 31, Ex. 2 at 1-8.

## III.    PROCEDURAL BACKGROUND

Petitioner appealed his judgment and sentence to the Washington Court of Appeals. Dkt. 31, Exs. 3-7. On January 9, 2017, the Court of Appeals issued an unpublished opinion in which it affirmed Petitioner's conviction. *Id.*, Ex. 2. Petitioner thereafter filed a *pro se* petition for review with the Washington Supreme Court. *Id.*, Ex. 8. The Supreme Court denied the petition for review without comment on August 2, 2017. *Id.*, Ex. 13. The Washington Court of Appeals issued its mandate terminating direct review on August 11, 2017. *Id.*, Ex. 14.

On June 13, 2016, while his direct appeal was pending, Petitioner filed a *pro se* petition for writ of habeas corpus in the Washington Supreme Court. *Id.*, Ex. 15. The Supreme Court re-designated Petitioner's submission as a personal restraint petition and transferred the petition to the Washington Court of Appeals for consideration. *Id.*, Exs. 16-17. On July 19, 2016, the Court of Appeals stayed Petitioner's personal restraint petition pending resolution of his direct appeal. *Id.*, Ex. 19. The Court of Appeals issued an order lifting the stay on April 9, 2018, and

---

[3] [Court of Appeals footnote 1] *Frye v. United States,* 93 F. 1013 (D.C. Cir. 1923).

REPORT AND RECOMMENDATION
PAGE - 6

then, at Petitioner's request, stayed the proceedings again on June 4, 2018, to allow Petitioner time to file an amended petition. *Id.*, Exs. 20-22. Petitioner thereafter filed multiple amended petitions. *Id.*, Exs. 23-25. On August 19, 2019, the Court of Appeals issued an order dismissing petitioner's personal restraint petition. *Id.*, Ex. 32.

Petitioner next sought review in the Washington Supreme Court of the Court of Appeals' decision dismissing his personal restraint petition. *Id.* Ex. 33. *See also id.*, Exs. 34-36. The Supreme Court Commissioner issued a ruling denying review on April 3, 2020. *Id.*, Ex. 37. Petitioner moved to modify the Commissioner's ruling, and that motion was denied on July 8, 2020. *Id.*, Exs. 38, 40. The Court of Appeals issued a certificate of finality in Petitioner's personal restraint proceedings on August 21, 2020. *Id.*, Ex. 41.

Petitioner now seeks federal habeas review of his conviction. Petitioner originally filed his petition for writ of habeas corpus in the Eastern District of Washington on July 7, 2021. *See* Dkt. 1. The Eastern District thereafter transferred the petition to this district for consideration. Dkt. 6. Petitioner's second amended petition for writ of habeas corpus (Dkt. 24), filed November 19, 2021, is the operative petition in this action. The briefing with respect to the second amended petition is now complete, and this matter is ripe for review.

## IV.    GROUNDS FOR RELIEF

Petitioner identifies the following four grounds for relief in his second amended petition:

GROUND ONE:  Insufficiency of evidence.  Amend 14, Due Process Clause.  \

GROUND TWO:  Substantive Due Process Violation.  Amend 14 Admission at trial of "confession" obtained by methods that shock the conscience.  \

GROUND THREE:  Cumulative violations to my right to a fair trial were prejudicial.  Amends 6, 14.  \

REPORT AND RECOMMENDATION
PAGE - 7

GROUND FOUR:  Denial of hearing in violation of procedural due process. Amend 14.  Strict application of res judicata was contrary to clearly-established law.  28 U.S.C. § 2254(d)(1)[.]  \

*See* Dkt. 24 at 8, 10, 11, 13, 15-17.

## V.    DISCUSSION

Respondent concedes that Petitioner fairly presented his claims to the Washington Supreme Court and that he has therefore exhausted his state remedies in accordance with 28 U.S.C. § 2254(b).  Dkt. 30 at 8.  Respondent argues, however, that Petitioner is not entitled to relief with respect to any of the claims asserted in his federal habeas petition.  *See id*. at 17-27.

### A.    Standard of Review

Federal habeas corpus relief is available only to a person "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A habeas corpus petition may be granted with respect to any claim adjudicated on the merits in state court only if the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or if the decision was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  Under the "unreasonable application" clause, a federal habeas court may grant the writ only if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  *See id*. at 407-09.

REPORT AND RECOMMENDATION
PAGE - 8

The Supreme Court has made clear that a state court's decision may be overturned only if the application is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). The Supreme Court has also explained that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Clearly established federal law means "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer*, 538 U.S. at 71-72. "If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

In considering a habeas petition, this Court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011). If a habeas petitioner challenges the determination of a factual issue by a state court, such determination shall be presumed correct, and the applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**B.    Analysis**

*1.    Sufficiency of the Evidence*

Petitioner asserts in his first ground for relief that he was convicted based on insufficient evidence, in violation of the Fourteenth Amendment's Due Process Clause. Dkt. 24 at 8, 15. Petitioner argues in support of his sufficiency of the evidence claim that his confession to

REPORT AND RECOMMENDATION
PAGE - 9

Wendell Morris was improperly admitted at trial and that the trial court gave undue weight to Mr. Morris's incriminating testimony while excluding the forensic evidence from its consideration. *See id.* at 15.

The Due Process Clause of the Fourteenth Amendment requires that the prosecution prove beyond a reasonable doubt each element of the charged offense. *Carella v. California*, 491 U.S. 263, 265 (1989) (citing *In re: Winship*, 397 U.S. 358, 364 (1970)). Due process claims challenging the sufficiency of the evidence are evaluated under the standard announced in *Jackson v. Virginia*, 443 U.S. 307 (1979). The Supreme Court explained in *Jackson* that the relevant question in evaluating a claim of insufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. The Supreme Court has made clear that it is the responsibility of the trier of fact, and not a reviewing court, to decide what conclusions should be drawn from the evidence admitted at trial. *Cavazos v. Smith*, 565 U.S. 1, 2 (2011).

The Supreme Court has also made clear that sufficiency of the evidence claims are subject to a second layer of judicial deference on federal habeas review. Specifically, the Supreme Court has held that "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (citing *Cavazos*, 565 U.S. at 2).

Because Petitioner waived his right to a jury trial, the verdict in his case was rendered by the trial court itself. The trial court gave its oral decision to the parties on February 4, 2015, which included detailed findings of fact and conclusions of law. Dkt. 33, Ex. 77. The Court

REPORT AND RECOMMENDATION
PAGE - 10

1   thereafter entered written findings and conclusions in accordance with Rule 6.1(d) of the

2   Criminal Rules for Superior Court.  *See* Dkt. 31, Ex. 29 at 55-60.

3       The trial court noted in its findings that there was substantial circumstantial evidence

4   suggesting Petitioner's involvement in the crime.  *See* Dkt. 31, Ex. 29 at 56-59; Dkt. 33, Ex. 77

5   at 5-13.  In particular, the court found that at the time of Susann Smith's death in February 2013,

6   Petitioner and Ms. Smith were in the midst of contentious dissolution proceedings, Petitioner

7   was obsessed with the dissolution, and Petitioner frequently expressed his frustrations about the

8   dissolution proceedings to co-workers and family members.  Dkt. 31, Ex. 29 at 56; Dkt. 33, Ex.

9   77 at 5-6.  Petitioner also expressed concern that Ms. Smith would take their two children back

10  to her native Germany.  *See id*.

11      The trial court further found that in the fall of 2012, Petitioner made statements to a

12  woman he was involved with that he would like Ms. Smith to disappear, and Petitioner asked the

13  woman if she knew of anyway to "get rid of" someone.  Dkt. 31, Ex. 29 at 56; Dkt. 33, Ex. 77 at

14  6.  At around the same time, Petitioner purchased a rubber mallet and disposable coveralls, items

15  which were consistent with the murder weapon and fabric impressions found at the murder

16  scene.  Dkt. 31, Ex. 29 at 56-57; Dkt. 33, Ex. 77 at 6-7, 9.

17      The trial court found that forensic evidence obtained at the crime scene included a DNA

18  match to Petitioner on a washcloth located under Ms. Smith's body in the bathtub, and bloody

19  footprints that could have been made by Petitioner.  Dkt. 31, Ex. 29 at 57; Dkt. 33, Ex. 77 at 9.

20  And, in its oral findings, the trial court noted that, in the early morning hours of February 11,

21  2013, a man was seen riding a bike on a route that could lead to Ms. Smith's house and, a couple

22  of hours later, the same man was seen riding a bike in the opposite direction on a route that could

23  lead to Petitioner's home.  Dkt. 33, Ex. 77 at 10-11.  Evidence was also presented that a bicycle

REPORT AND RECOMMENDATION
PAGE - 11

Petitioner had recently purchased was later found abandoned in a ravine near Petitioner's apartment complex. *Id*., Ex. 77 at 13.

The trial court also found that GPS evidence showed some suspicious and unusual travel by Petitioner on February 11-12, 2013. Dkt. 31, Ex. 29 at 57-58; Dkt. 33, Ex. 77 at 12. In particular, on the morning of February 11, 2013, Petitioner made an unexplained detour to the area of some dumpsters. *Id*. On February 12, 2013, Petitioner left work mid-day and made stops at Wal-Mart and Home Depot where he purchased disposable coveralls, masking tape, croc-style shoes with soles consistent with bloody footprints found at the murder scene, latex gloves, and a gas can, before driving to the area of Ms. Smith's residence, which was at that time barricaded by police. *Id*. Additional suspicious activity noted by the trial court included various internet searches, including searches for flights to Venezuela for one adult and two children on the morning of February 12, 2013, and a modified search for flights for one adult after Petitioner's children were placed with Child Protective Services ("CPS"). *Id*.

After detailing the circumstantial evidence suggesting Petitioner's likely involvement in the crime, the trial court went on to explain that none of that evidence was sufficient to establish beyond a reasonable doubt that Petitioner was guilty of the crime of murdering Ms. Smith, but that the evidence must be considered in light of Petitioner's interactions with Mr. Morris to whom Petitioner confessed. *See* Dkt. 31, Ex. 29 at 58-59; Dkt. 33, Ex. 77 at 13-16. The trial court concluded that Petitioner's confession to Mr. Morris, in combination with the other evidence presented at trial, established beyond a reasonable doubt that Petitioner was responsible for the murder of Ms. Smith. Dkt. 31, Ex. 29 at 59; Dkt. 33, Ex. 77 at 13, 16.

Petitioner presented his sufficiency of the evidence claim to the state courts on direct appeal and on collateral review, and the state courts uniformly rejected the claim. *See* Dkt. 31,

REPORT AND RECOMMENDATION
PAGE - 12

1   Ex. 2 at 19-20, Ex. 32 at 7-8; Dkt. 32, Ex. 37 at 7.  On collateral review, the Washington Court

2   of Appeals noted, and apparently affirmed, that the circumstantial evidence detailed by the trial

3   court, in combination with Petitioner's confession to Mr. Morris, established beyond a

4   reasonable doubt that Petitioner killed Ms. Smith.  Dkt. 31, Ex. 32 at 7-8.  The Washington

5   Supreme Court, on review of the Court of Appeals' decision, agreed that the evidence was

6   sufficient to support Petitioner's conviction.  The Supreme Court Commissioner explained his

7   conclusion as follows:

> Mr. Smith argues that the State failed to prove him guilty beyond a reasonable
> doubt.  But following a conviction, the evidence is viewed in a light most
> favorable to the State, with all reasonable inferences from circumstantial evidence
> viewed in a manner supporting the prosecution.  *State v. Salinas*, 119 Wn.2d 192,
> 201, 829 P.2d 1068 (1992).  Here, the evidence showed that Mr. Smith had
> expressed a desire to get rid of the victim because of an acrimonious divorce, he
> had purchased items consistent with the murder weapon and evidence found at the
> scene, a man was seen riding a bike near the scene of the murder and Smith's bike
> was later located nearby, and Smith made internet searches for flights to
> Venezuela after he was notified of the death.  Viewed in the light most favorable
> to the prosecution, taken together and drawing all inferences in favor of the State,
> this evidence was sufficient to support the murder conviction.

15   Dkt. 32, Ex. 37 at 7.[4]

16          Petitioner's argument in support of his sufficiency of the evidence claim focuses on

17   various aspects of his confession to Mr. Morris and whether the confession was properly

18   admitted into evidence at trial.  *See* Dkt. 24 at 15 and Ex. B at 2.  In particular, Petitioner asserts

19   that the police acted improperly in obtaining the confession, and that the confession was

20   improperly admitted into evidence without a determination of voluntariness.  *Id*. at 15.  Petitioner

---

[4] This Court's analysis necessarily focuses on the Commissioner's ruling as it is the last reasoned decision
of the state courts on this issue.  *See Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005) ("When more than
one state court has adjudicated a claim, [the Court analyzes] the last reasoned decision.").

REPORT AND RECOMMENDATION
PAGE - 13

also asserts that admission of the confession violated his rights under the Confrontation Clause and other unspecified state rules of evidence. *Id.*

The Court observes that prior to trial, Petitioner sought to have his statements to Mr. Morris suppressed only on the grounds that the statements were protected from disclosure by the clergy-penitent privilege. The trial court held an evidentiary hearing after which it concluded that the asserted privilege did not apply. *See* Dkt. 31, Ex. 29 at 46-53. Petitioner argued on appeal that the trial court erred in refusing to suppress the statements, but the Court of Appeals rejected that argument. *Id.*, Ex. 2 at 8-11. Petitioner also offered a myriad of other arguments to the state appellate courts as to why his statements to Mr. Morris should not have been admitted, including those identified here in the context of Petitioner's sufficiency of the evidence claim, and the state courts consistently rejected those arguments. *See id.*, Ex. 2 at 18 n.6, Ex. 32 at 13-15. Petitioner does not present any independent challenge to the admissibility of his confession in this federal habeas action, nor does he offer any argument in the context of his sufficiency of the evidence claim addressing the prior state court decisions and why he believes issues pertaining to the admissibility of his confession were wrongly decided. This Court must therefore conclude, based on the record before it and the absence of Petitioner's arguments to the contrary, that Petitioner's confession was properly admitted.

In addition to Petitioner's challenges to the admissibility of his confession, he also takes issue with two statements in the Supreme Court Commissioner's decision that he claims are erroneous. *See* Dkt. 24, Ex. B at 2. The statements at issue did not appear in the discussion of Petitioner's sufficiency of the evidence claim but, instead, appeared in the portion of the Commissioner's ruling setting forth the underlying facts relevant to Petitioner's asserted claims. The first challenged statement is: "Witnesses reported seeing a man riding a bicycle near

REPORT AND RECOMMENDATION
PAGE - 14

Susann's home in the early morning on the day she was murdered." *See id*.; *see also* Dkt. 32, Ex. 37 at 3.  Petitioner suggests that this statement is erroneous because it is inconsistent with the defense theory as to when Ms. Smith was murdered.  The statement, however, is consistent with the State's theory of when the crime occurred and, as noted above, the Court views all evidence in the light most favorable to the State in conducting its sufficiency review.  The fact that the statement was inconsistent with the defense theory is therefore irrelevant.

The second challenged statement is: "Data retrieved from a GPS device in Mr. Smith's car revealed that on the day Susann's body was discovered, Mr. Smith had stopped by some dumpsters in a grocery store parking lot after dropping the children off at school." *See* Dkt. 32, Ex. 37 at 3.  Petitioner contends that the GPS data showed he stopped in a grocery store parking lot but did not show him near the dumpsters. Dkt. 24, Ex. B at 2.  Petitioner also contends that the evidence showed the stop was on February 11, 2013, the day before Susann's body was found.  *Id*.  Petitioner is correct that the evidence presented at trial showed the stop in the grocery store parking lot occurred on February 11th and not February 12th.  However, this inaccuracy does not undermine the Commissioner's conclusion with respect to Petitioner's sufficiency of the evidence claim.  Indeed, the Commissioner did not even reference this fact in disposing of the claim.  With respect to Petitioner's complaint that the evidence did not show he stopped near the dumpsters, the Court again notes that the Commissioner did not reference this fact in disposing of Petitioner's claim and, in any event, the Commissioner was obliged, as is this Court, to review such evidence in the light most favorable to the State.

Ultimately, none of Petitioner's arguments demonstrate that the Washington Supreme Court Commissioner's resolution of his sufficiency of the evidence claim is contrary to, or constitutes an unreasonable application of, United States Supreme Court law.  The Court does

REPORT AND RECOMMENDATION
PAGE - 15

note that the Commissioner, in ruling on this claim, made reference only to the circumstantial evidence detailed in the trial court's findings and did not reference Petitioner's confession. *See* Dkt. 32, Ex. 37 at 7. This is a notable omission given that the trial court expressly stated in its findings and conclusions that the circumstantial evidence alone was insufficient to establish beyond a reasonable doubt that Petitioner was guilty of murdering Ms. Smith.[5] It bears repeating, however, that the applicable standard on sufficiency review is whether *any* rational trier of fact could have found the elements of the crime beyond a reasonable doubt. Leaving aside the trial court's conclusion that the circumstantial evidence was not sufficient to convict, a "rational trier of fact" could arguably have concluded, based solely on the circumstantial evidence, that the evidence was sufficient to find Petitioner guilty of murdering Ms. Smith.

Finally, even assuming the Commissioner's omission of any reference to the confession renders his conclusion suspect, this Court's independent review of the trial transcript and the remainder of the state court record makes clear that there was, indeed, sufficient evidence from which the trial court could conclude that Petitioner was responsible for the murder of Ms. Smith. Petitioner's federal habeas petition should therefore be denied with respect to his first ground for relief.

### 2.    *Substantive Due Process Violation*

Petitioner asserts in his second ground for relief that coercive conduct by state officials in obtaining a confession from him, which was admitted into evidence at trial, "shocks the conscience" and therefore violated his substantive due process rights. Dkt. 24 at 10, 16.

---

[5] It appears that the Court of Appeals, on direct appeal of Petitioner's conviction, also concluded that the evidence was sufficient to support Petitioner's conviction even without Petitioner's confession. *See* Dkt. 31, Ex. 2 at 19-20.

REPORT AND RECOMMENDATION
PAGE - 16

1   Petitioner claims that police initiated the seizure and detention of his children several months

2   prior to his arrest in order to coerce Plaintiff's cooperation in their investigation and obtain an

3   incriminating statement. *Id*. at 16.

4         The United States Constitution requires that any confession admitted at trial be

5   voluntarily given. *Dickerson v. United States*, 530 U.S. 428, 433 (2000). In determining

6   whether a confession was voluntary, courts examine "whether a defendant's will was overborne

7   by the circumstances surrounding the giving of a confession." *Id*. at 434 (citation and internal

8   quotation marks omitted). "The due process test takes into consideration 'the totality of all the

9   surrounding circumstances—both the characteristics of the accused and the details of the

10   interrogation.'" *Id*. (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)); *see also*

11   *Arizona v. Fulminante*, 499 U.S. 279, 285-88 (1991). "The determination 'depend[s] on a

12   weighing of the circumstances of pressure against the power of resistance of the person

13   confessing.'" *Dickerson*, 530 U.S. at 434 (quoting *Stein v. New York*, 346 U.S. 156, 185 (1953)).

14         In *Colorado v. Connelly*, 479 U.S. 157 (1986), the Supreme Court made clear that

15   "coercive police activity is a necessary predicate to the finding that a confession is not

16   'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Id*. at

17   167. "Coercion can be mental or physical, but to render a statement involuntary, coercion must

18   exist to such a degree that the statement is not 'the product of an essentially free and

19   unconstrained choice by its maker.'" *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005)

20   (quoting *Schneckloth*, 412 U.S. at 225).

21         The Washington Court of Appeals considered and rejected Petitioner's challenge to the

22   admissibility of his statements to law enforcement in Petitioner's personal restraint proceedings.

23   The Court of Appeals explained its conclusion as follows:

REPORT AND RECOMMENDATION
PAGE - 17

Smith next contends that his confession to law enforcement should have been inadmissible because it was obtained through coercion.  He contends that he cooperated with the law enforcement investigation because detectives told him that his children were in Child Protective Services (CPS) custody and that "[a] reasonable person would not consider himself free to ignore police requests for information under the circumstances."

Detectives drove to Boeing to talk with Smith on February 12, 2013, the date of Susann's death.  They interviewed Smith for approximately 25-30 minutes until one of them asked Smith if he had any reason to harm his wife and Smith requested an attorney.  The detectives ceased questioning him and told him he was free to leave.  Smith went back to his office and one of the detectives called his commander, who stated that Smith's children were being placed in CPS custody.  The detectives then informed Smith that CPS was taking custody of his children and he could obtain the CPS paperwork at the Bothell Police Department.  Smith drove to the police department. En route, he called the detective's phone and authorized a search of his car and apartment, and offered to voluntarily give a DNA sample.  The searches took place that evening.  At the conclusion of the search, Smith gave another hour-long interview to the detectives.

On February 16, 2013, the detectives visited Smith's apartment again.  A detective told Smith that CPS would retain the children until Smith was cleared in the murder investigation.  Smith willingly spoke with detectives for some time but eventually became agitated and told the detectives to leave.  On February 22, 2013, detectives returned to Smith's apartment to serve search warrants and talked with Smith for approximately an hour.  Smith ended the interview, stating "I don't have anything else to say."  On March 8, 2013, Smith went to the police department to retrieve the keys to his car.  The detectives asked if they could question Smith further.  Smith refused to answer any questions on the advice of his attorney.  On June 27, 2013, detectives contacted Smith and told him they had spoken to Morris.  Smith indicated he did not want to speak to the detectives.  He was arrested and read his *Miranda* rights.  Following a CrR 3.5 hearing, the trial court found that Smith was not in custody on February 12, February 16 or February 22 because a reasonable person in Smith's position would not have believed he was in custody.

A defendant's statements made in a noncustodial setting are voluntary and therefore admissible if, under the totality of the circumstances, the statement was not coerced.  *State v. Broadaway*, 133 Wn.2d 118, 132, 942 P.2d 363 (1997).  A statement is coerced if it is obtained by promises or misrepresentations by law enforcement that overcome the free will of the defendant.  *Broadaway*, 133 Wn.2d at 132.  An officer's encouragement to a suspect to cooperate, or other psychological ploys, may affect a suspect's decision to confess, but the confession is voluntary "so long as that decision is a product of the suspect's own balancing

REPORT AND RECOMMENDATION
PAGE - 18

1    of competing considerations." *State v. Unga*, 165 Wn.2d 95, 102, 196 P.3d 645

2    (2008).

3            Here, there is nothing in the record indicating that Smith's free will was overcome by the fact that his children were in CPS custody. On several occasions

4    Smith felt free to terminate questioning by detectives and indeed did so. There was substantial evidence that Smith's statements to detectives were voluntary.

5    Dkt. 31, Ex. 32 at 15-18.

6            Petitioner fails to demonstrate that the Court of Appeals' resolution of his second ground

7    for relief is contrary to, or constitutes an unreasonable application of, United States Supreme

8    Court law. This Court first observes that Petitioner does not identify in his habeas petition, or in

9    his response to Respondent's answer, the precise nature of the inculpatory statements at issue

10    here. While Petitioner references a "confession" in his petition, the only apparent confession

11    was the one Petitioner made to Mr. Morris in June 2013, and nothing in the record suggests that

12    there was any police involvement in obtaining that statement. This lack of specificity renders the

13    claim, as asserted here, vague and confusing.

14            Petitioner, in his response to Respondent's answer, asserts in a conclusory fashion that

15    the state court's adjudication of his second ground for relief was an unreasonable application of

16    clearly established law as set forth in *Rochin v. California*, 342 U.S. 165 (1952), and *Lynumn v.*

17    *Illinois*, 372 U.S. 528 (1963).

18            In *Rochin*, the Supreme Court vacated the defendant's conviction for drug possession and

19    reversed the lower court's admission of the drugs where officers broke into the defendant's

20    house without a warrant, attempted to forcibly remove pills from his throat, and took him to a

21    hospital and had his stomach pumped against his will. *Rochin*, 342 U.S. at 166, 174. The

22    government, over the defendant's objection, used the capsules removed from his stomach to

23    obtain a conviction. *Id*. at 166. The Supreme Court reversed, holding that the defendant's

REPORT AND RECOMMENDATION
PAGE - 19

conviction for possessing the morphine tablets was so fundamentally unfair as to violate the Due Process Clause. *Id*. at 174. The Supreme Court observed that the officers' conduct "shocks the conscience," and that their methods were "too close to the rack and screw to permit of constitutional differentiation." *Id*. at 172.

In *Lynumn*, the defendant was prosecuted for, and convicted of, the unlawful sale and possession of marijuana. *Lynumn*, 372 U.S. at 529. At trial, the arresting officers testified to an oral confession made by the defendant and the time of her arrest. *See id*. at 530. The Supreme Court determined that the defendant confessed "only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate.'" *Id*. at 534. The Court held that it was "clear" that these threats, delivered while the police officers encircled the defendant, produced an "impellingly coercive effect" that made the confession involuntary. *Id*. at 534–35.

While Petitioner offers no argument to support his conclusory assertion that these two cases render the state court's decision in his case unreasonable, the Court presumes that Petitioner intends to suggest that the circumstances of his case are similar to those in *Rochin* and *Lynumn*. They are not. The egregious conduct of law enforcement in *Rochin* and *Lynum* bears no resemblance to the conduct of law enforcement in Petitioner's case. The Washington Court of Appeals applied the appropriate "totality of the circumstances" test in reviewing Petitioner's challenge to the admission of his statements to police, and reasonably concluded that there is nothing in the record indicating Petitioner's free will was overcome by the fact that his children were taken into CPS custody. Petitioner's federal habeas petition should therefore be denied with respect to his second ground for relief.

REPORT AND RECOMMENDATION
PAGE - 20

3.    *Cumulative Error*

Petitioner asserts in his third ground for relief that the cumulative effect of the constitutional violations alleged in his first and second grounds for federal habeas relief, and the violations alleged in proceedings before the state courts, denied him his right to a fair trial.  *See* Dkt. 24 at 11, 18.  The violations alleged in the state courts, which Petitioner now attempts to incorporate into his cumulative error claim, include:  (1) the admission of Wendell Morris's testimony violated the Confrontation Clause; (2) the prosecutor's questioning of Mr. Morris was improper and resulted in the admission of Petitioner's confession; (3) the state failed to timely disclose an exculpatory DNA report causing Petitioner to have to choose between his right to a speedy trial and his right to adequately prepared counsel; (4) Petitioner was denied counsel of his choice; (5) Petitioner was constructively denied counsel when his appointed counsel refused to raise a coercion claim and disregarded his demand that he be prepared to testify; and (6) Petitioner's speedy trial rights were violated.  *See id*. at 6, 17; *see also* Dkt. 35 at 10.

The Ninth Circuit Court of Appeals has recognized the "cumulative error" doctrine which provides that even where no single error rises to the level of a constitutional violation, "the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair."  *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284 (1973)).  The Ninth Circuit explained in *Parle* that "the fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,' . . . and thereby had a 'substantial and injurious effect or influence' on the jury's verdict."  *Id*. at 928 (citations omitted).

REPORT AND RECOMMENDATION
PAGE - 21

As explained above, Petitioner has not demonstrated any error with respect to his first and second grounds for relief.  The additional errors asserted by Petitioner in his state court proceedings were not presented to this Court as independent grounds for federal habeas relief and, thus, this Court has had no opportunity to consider the substance of the claims.  Petitioner appears to be of the belief that because he exhausted his additional claims in the state courts they are properly included in his cumulative error claim.  *See* Dkt. 35 at 10.  This is simply not the case.  Because Petitioner did not identify the claims in his federal habeas petition as separate grounds for relief, they are not properly before this Court for consideration either independently or as a part of Petitioner's cumulative error claim.  The state courts, in resolving the claims, found no error and that conclusion is binding on this Court on federal habeas review.  As Petitioner fails to establish that any errors occurred, his claim that the accumulation of several errors requires reversal of his conviction necessarily fails.  Accordingly, Petitioner's federal habeas petition should be denied with respect to his third ground for relief.

### 4.    *Denial of Hearing*

Petitioner asserts in his fourth ground for relief that his due process rights were violated when the state appellate courts denied him a hearing and failed to adjudicate his substantive constitutional claims on the merits on collateral review.  Dkt. 24 at 13, 17.  Petitioner's fourth ground for relief is not a model of clarity, but he appears to take issue with the standards applied by the state courts in addressing the claims asserted in his personal restraint petition and his motion for discretionary review.  Petitioner argues that the Acting Chief Judge of the Court of Appeals improperly dismissed his substantive claims by using the procedure under Washington Rule of Appellate Procedure ("RAP") 16.11(b), which is reserved for frivolous findings, while also reasoning that Petitioner's claim were "arguable/debatable."  *Id*. at 13.  Petitioner also

REPORT AND RECOMMENDATION
PAGE - 22

appears to argue that the Washington Supreme Court Commissioner erred in invoking RAP

13.4(b) in reviewing and affirming the Court of Appeals' dismissal of Petitioner's personal

restraint petition as frivolous under RAP 16.11(b).  *Id*.

In fact, nothing in the Acting Chief Judge's order dismissing Petitioner's personal

restraint petition indicates that he found Petitioner's claims arguable or debatable.  Rather, it

appears clear that he deemed the claims frivolous as evidenced by the fact that he did not refer

Petitioner's petition to a panel of judges for a determination on the merits.  *See* RAP 16.11(b).

Petitioner's argument with respect to the actions of the Washington Supreme Court is largely

incomprehensible.  This Court can glean only that Petitioner believes the Supreme Court

Commissioner erred in agreeing with the Acting Chief Judge that Petitioner's claims were

frivolous.  *See* Dkt. 24 at 13.

The Ninth Circuit Court of Appeals has made clear that "federal habeas relief is not

available to redress alleged procedural errors in state post-conviction proceedings."  *Ortiz v.*

*Stewart*, 149 F. 3d 923, 939 (9th Cir. 1998), *overruled on other grounds as recognized by Apelt*

*v. Ryan*, 878 F.3d 800, 827-28 (9th Cir. 2017); *Franzen v. Brinkman*, 877 F.2d 26 (9th Cir.

1989).  Petitioner appears to challenge in his fourth ground for relief the procedural rules applied

by the state courts in rejecting his claims on collateral review.  Such a challenge is not

cognizable on federal habeas review.  Accordingly, Petitioner's federal habeas petition should be

denied with respect to his fourth ground for relief.

### C.    Certificate of Appealability

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's

dismissal of his federal habeas petition only after obtaining a certificate of appealability from a

district or circuit judge.  A certificate of appealability may issue only where a petitioner has

REPORT AND RECOMMENDATION

PAGE - 23

made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).  A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Under this standard, this Court concludes that Petitioner is not entitled to a certificate of appealability with respect to any of the claims asserted in his petition.

## VI.    CONCLUSION

For the reasons set forth above, this Court recommends that Petitioner's second amended petition for writ of habeas corpus be denied, and that this action be dismissed with prejudice. This Court further recommends that a certificate of appealability be denied.  A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14) days** after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **May 6, 2022**.

DATED this 13th day of April, 2022.

S. KATE VAUGHAN
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 24